Elton WARREN, Plaintiff-Appellee,

v.

HUDSON PULP & PAPER CORP., Defendant-Appellant and Third Party Plaintiff-Appellee,

v.

TREADWELL CORP., Third Party Defendant-Appellant.

Nos. 258, 259,
Dockets 72–1847, 72–1848.

United States Court of Appeals, Second Circuit.

Argued Jan. 4, 1973.

Decided March 29, 1973.

230

Paul C. Matthews, New York City, for plaintiff-appellee.

William F. McNulty, New York City (Hanner, Fitzmaurice & Onorato, New York City, on the brief), for defendant-appellant and third party plaintiff-appellee.

Joseph D. Ahearn, New York City (Daniel J. Coughlin, New York City, on the brief), for third party defendant-appellant.

\* Chief Judge of the District Court for the District of Vermont, sitting by designation.

1. The plaintiff originally sued his employer, Treadwell Corp., as well as Hudson Pulp & Paper Corp. At trial, however,

Before FRIENDLY, Chief Judge, KAUFMAN, Circuit Judge, and HOLDEN,\* District Judge.

HOLDEN, District Judge:

In June, 1965, the plaintiff, a rigger by trade, was employed by Treadwell Corporation, a New York construction corporation, as a boilermaker foreman. He was hired to supervise the construction of two boilers on a project undertaken by Treadwell, in the performance of a construction contract with the defendant Hudson Pulp & Paper Corporation to expand the latter's industrial plant in Palatka, Florida. This diversity suit was instituted by the plaintiff to recover for permanent damage to his respiratory system caused by the inhalation of noxious and toxic fumes produced in Hudson's industrial operation adjacent to the construction site.[1]

The jury awarded the plaintiff damages for Hudson's negligence in the amount of $150,000. Judge MacMahon ordered a judgment to be entered in the same amount against Treadwell on the strength of an indemnity provision in its construction contract with Hudson. Hudson appeals from the judgment in the main action, contending that it was not negligent under Florida law. Treadwell appeals from that judgment and from the judgment entered against it in the indemnity action. We affirm both judgments.

Hudson owns and operates a kraft paper mill in Palatka, Florida, which produces 950 tons per day of converted products, bag and tissue. In April, 1965, Treadwell contracted with Hudson to complete the expansion of Hudson's plant. The work covered by the contract between Treadwell and Hudson was performed under the general supervision of J. E. Sirrine Company, Hud-

he discontinued his action against Treadwell on the ground that the Florida workmen's compensation law provided his sole remedy against his employer. It was thereupon stipulated that the cross-claim of Hudson against Treadwell be treated as a third-party complaint.

son's architect and supervising engineer for the project. This consultant maintained a staff of approximately twelve men on the site to coordinate the work of the various trades and see that contract specifications were fulfilled.

Under the contract Treadwell agreed to supply the materials and labor necessary to the expansion of the plant. Treadwell also agreed to extend the smokestacks of the No. 4 Power Boiler and the No. 2 Bark Boiler at the existing plant an additional 50 feet each. The contract further provided that Treadwell would assume the liability for any damages or injuries which occurred during the project as a result of Hudson's negligence. The contract provided, however, that the work was to be performed in accordance with a construction schedule prepared for Hudson by the supervising engineer, J. E. Sirrine Company.

Elton Warren began work on the Palatka project on June 1, 1965. The work which Warren was assigned was the construction of two new boilers. To accomplish this, Warren and the other workers worked from an outdoor steel framework of the building under construction at heights of 90 to 100 feet. This job site was located some 75 feet from the smokestacks of the No. 2 Bark Boiler and the No. 4 Power Boiler of Hudson's existing plant and not connected or related to the new boilers under construction. The No. 2 and No. 4 boilers continued in operation during the plant expansion until early September.

The No. 2 and No. 4 boilers burned a low grade fuel oil that produced smoke containing sulphur dioxide and carbon dioxide gases. Sulphur dioxide is a toxic gas capable of causing serious lung damage to one who inhales it. The smoke emitted from the stacks enveloped the structural framework where Warren and the other men were working when the wind was blowing in that direction, making it hazardous for the construction workers to remain at work. The smoke made it difficult for the workmen to breathe and caused nausea, sore throats, running noses and watery eyes. At times the men came down to the ground to escape the fumes. These working conditions were not improved nor corrected until Hudson shut down the boilers during the Labor Day weekend. At that time the stacks were lengthened to allow the smoke to pass over the heads of the Treadwell workers. The elevation of the stacks greatly improved the working conditions and substantially eliminated the smoke hazard.

From the time he began work at Palatka, on June 1, until Labor Day, the plaintiff suffered from the fumes. He made frequent complaints to the Treadwell general foreman. Each time he was told that the situation would be corrected within a few days. Treadwell, in turn, had been informed in June by the supervising engineer, J. E. Sirrine Company, that a stack extension would be fabricated to enable Treadwell to lengthen the offending stacks.

After he stopped work at Palatka, the plaintiff discovered that he had developed a permanent and progressively worsening pulmonary condition which prevented oxygen from diffusing properly into his bloodstream. The cause and extent of the plaintiff's injury are not questioned in this appeal; only liability is challenged.

### The Motion to Dismiss

■ At the conclusion of the plaintiff's evidence, the defendant Hudson moved to dismiss the complaint on the ground that ". . . the plaintiff failed to make out a prima facie case under the law of Florida." No motion for a directed verdict, as such, was offered by either Hudson or Treadwell. Both appellants, however, join in the claim of error and apparently rely on the motion to dismiss as a motion for a directed verdict. In this context a motion to dismiss in a jury trial may be allowed to do service for a motion for directed verdict under Rule 50(a). C. Wright and A. Miller, Federal Practice and Procedure § 2371. We so regard it for the purposes of this review.

In Florida a landowner owes two duties to a business invitee: (1) to use reasonable care in maintaining the premises in a reasonably safe condition; and (2) to give the invitee warning of concealed perils which are or should be known to the landowner, and which are unknown to the invitee and cannot be discovered by him through the exercise of due care. Hall v. Holland, 47 So.2d 889, 891 (Fla.1950); Restatement, Torts 2d § 343. The employee of an independent contractor has the status of a business visitor. Hall v. Holland, *supra;* Hickory House v. Brown, 77 So.2d 249, 252 (Fla.1955).

This was more recently stated in Hamilton v. Armstrong Co., 371 F.2d 139, 140 (5th Cir. 1967).

It is settled law in Florida that an owner is under a duty to use reasonable care in maintaining his premises in a reasonably safe condition and to give timely notice or warning of latent and concealed perils known to the owner, or which by the exercise of due care should have been known to him, and which are not known to an invitee or which by the exercise of due care could not have been known to him. This duty is the same whether the invitee be there as the employee of the owner or as the employee of an independent contractor.

The evidence presented at the trial established that the responsible officers and representatives of Hudson at the construction site were aware of the presence of sulphur dioxide in smoke produced by the combustion in Boilers No. 2 and No. 4. They knew or should have known the stacks were giving off poisonous fumes and the dangerous consequences which could result from continuing exposure to its toxicity.

Hudson's supervising engineer knew of the drift of the smoke which frequently enveloped the open structural frame where the plaintiff was working. Yet Hudson made no effort to correct the problem and gave no warning to Treadwell's employees of the danger from the inhalation of the fumes from its stacks.

The presence of foreseeable harm, coupled with the defendant Hudson's ability to arrange Treadwell's work schedule and its undisputed control of the offending stacks provide all of the necessary ingredients of a prima facie case of negligence under the law of Florida. The defendant's motion to dismiss the action was properly denied.

*Instructions to the Jury*

In submitting the issue of Hudson's negligence, Judge MacMahon instructed the jury:

In determining whether the defendant exercised due care under the circumstances, you may consider what knowledge the defendant had or that it should have had as to the dangerous qualities of the flue gas emitting from its stacks.

In this regard, a person who causes gases and fumes to be discharged into the atmosphere, an industrial company like this, has a duty to find out what is in those gases and whether they are noxious before it emits them into the atmosphere.

There were no objections by either defendant to these instructions. Both defendants, however, objected to the instructions which immediately followed.

The possessor of land, in these circumstances, has an additional duty to the plaintiff, a business visitor, to exercise reasonable care to discover the negligent acts or the likelihood of negligent acts by third persons like Treadwell, who were invited to come onto the property to perform services in connection with the business.

One aspect of this duty is that the possessor of the land, Hudson here, must exercise a reasonable, careful supervision of the appliances and the methods used by Treadwell, whom it employed or permitted to carry out on the land an activity directly or indirectly connected with the business use of the premises.

Hudson and Treadwell join to challenge this portion of the charge. Without reference to any Florida decisions, the appellants seem to rely on the law of New York, where it is said the safe place to work doctrine is far more extensive than in Florida, citing Watt and Sinclair of Florida, Inc. v. Hunter, 126 Fla. 750, 171 So. 817 (1937). Our concern, however, is with the law where the injury was inflicted.

■■ The underlying prerequisite to liability in the landowner is superior knowledge. Rist v. Florida Power & Light Co., 254 So.2d 540, 542 (Fla. 1971); Quinnelly v. Southern Maid Sugar Co., Inc., 164 So.2d 240, 242 (Fla. App.1964). The evidence in this case satisfies the demands of the Florida law since Hudson's officers knew of the chemical components of the combustion which gave off the poisonous fumes. While the plaintiff knew the stacks were disgorging smoke, he did not know that they were discharging poison that would damage lung tissue.

■ In the présence of a known danger, the fact that the dangerous condition was created or partially caused by an independent contractor will not shield the landowner from legal liability. *See* Peairs v. Florida Publishing Company, 132 So.2d 561 (Fla.App.1961). The duty of reasonable care is a responsibility that cannot be delegated. Florida follows the rule that an occupant of premises who has knowledge of a dangerous situation, even though created by an independent contractor, may incur liability through failure to halt the operation or otherwise remove the danger. Emelwon, Inc. v. United States, 391 F.2d 9 (5th Cir. 1968); Maule Industries, Inc. v. Messana, 62 So.2d 737 (Fla.1953); Breeding's Dania Drug Co. v. Runyon, 147 Fla. 123, 2 So.2d 376 (1941).

■ Here Hudson's supervising engineer was regularly present at the site where Treadwell employees were working. Hudson was in a position to know the methods employed by Treadwell. Being aware of the chemical content of the smoke drifting into the work area, it was also in a position to know the effect that Treadwell's methods of work might have on the health of the Treadwell workers. On this evidence it was not error to hold Hudson to the exercise of reasonable care in the supervision of its construction project with Treadwell.

The Court's instructions were consistent with the facts and correctly applied the law of Florida. We affirm the judgment for the plaintiff in the principal action.

### Third Party Action

The remaining question for review concerns the judgment that was rendered for Hudson on its third party complaint against Treadwell. The judgment was ordered by Judge MacMahon on the strength of the evidence presented in the principal action. This followed the court's binding instructions to the jury. No objection was offered to this method of dealing with the third party claim and it appears to be in keeping with the understanding of the court and counsel.

The trial court's award of indemnity to Hudson is founded on an indemnity agreement contained in the construction contract between Hudson and Treadwell. The indemnity agreement provided that Treadwell, "(t)he contractor shall assume the entire responsibility and liability for any and all damage and injury of any kind or nature whatsoever . . . to all persons, whether employees of the Contractor or otherwise . . . caused by, resulting from, arising out of, or occurring in connection with the execution of the work provided for in the Contract . . . ."[2] The force and effect of

---

2. 18. HOLD HARMLESS

The Contractor shall assume the entire responsibility and liability for any and all damage and injury of any kind or

nature whatsoever (including death resulting therefrom) to all persons, whether employees of the Contractor or otherwise and to all property caused by, result-

the indemnity agreement are govered by the law of New York.[3]

■ It is the law of that jurisdiction that one party to a contract may agree to indemnify another against the latter's own active negligence, where that intent is evident from the terms of the contract. Levine v. Shell Oil Co., 28 N.Y.2d 205, 321 N.Y.S.2d 81, 269 N.E.2d 799, 802 (1971). See Ciofalo v. Vic Tanney Gyms, Inc., 10 N.Y.2d 294, 1220 N.Y.S.2d 962, 177 N.E.2d 925, 926 (1961). Despite the obvious intent of the provision that Treadwell shall indemnify Hudson against Hudson's active negligence, Treadwell contends that the contract should not be enforced. It states these reasons: (a) It is against public policy to allow a party to receive contractual indemnity for negligence extending over several months; (b) Warren's injury was caused by Hudson's intentional wrongdoing, not by its negligence; (c) Hudson should be estopped from enforcing the indemnity agreement.

■ The terms of Treadwell's undertaking are sufficiently inclusive to justify indemnification, even though it can be said, as the indemnitor claims, that the plaintiff's injury was caused by Hudson's active negligence. Treadwell assumed entire responsibility to all persons, whether employees or not, for injuries sustained in the execution of its contract, even if such claims should be based upon the owner's active negligence.[4] With such a broad undertaking the New York courts hold the indemnitor to his bargain. Kurek v. Port Chester Housing Authority, 18 N.Y.2d 450, 276 N.Y.S.2d 612, 223 N.E.2d 25, 28 (1966).

■ *Public policy.* Treadwell maintains that this case is distinguishable from Levine v. Shell Oil Co., supra, and other New York indemnity cases, in that Warren's injury resulted not from a sudden accident, but from a dangerous condition tolerated by Hudson over a period of three months. *Levine* is not distinguishable on this basis. In *Levine,* the plaintiff was injured by a gas explosion which, although sudden, resulted from a leak which the indemnitee had knowingly tolerated for a long period of time. Treadwell agreed to indemnify Hudson freely and without reservation. Its undertaking will be enforced according to the intent expressed in the agreement.

■ *Intentional wrongdoing.* Treadwell's contention that Hudson was an intentional wrongdoer and thus is beyond protection of the indemnity agreement is similarly without merit. Tolerance of a known dangerous condition which eventually causes injury is negligent where the party permitting the danger to continue violates a duty owed to the plaintiff. But its neglect is no more than negligence; it is not an intentional wrong. See e. g., Levine v. Shell Oil Co., supra.

---

ing from, arising out of, or occurring in connection with the execution of the work provided for in the Contract; and if any person shall make a claim for any damage or injury (including death resulting therefrom) as herein above described, whether such claims be based upon Owner's alleged active or passive negligence, or participation in the wrong or upon any alleged breach of any statutory duty or obligation on the part of the Owner, the Contractor agrees to indemnify and save harmless the Owner, his agents, servants and employees, from and against any and all loss, expense, damage or injury that the Owner may sustain as a result of any such claim and the Contractor agrees to assume, on behalf of the Owner, and at his demand, the defense of any action at law or in equity, which may be brought against the Owner upon such claim and to pay on behalf of the Owner, upon his demand, the amount of any judgment that may be entered against the Owner in any such action. The Owner shall have the right to participate in such action.

3. The Treadwell's construction contract with Hudson (Def. Hudson's Exhibit C) provides:

"This Agreement has been executed and and entered in New York and the validity, interpertation and performance of the Contract shall be governed by the laws of the State of New York."

4. See Footnote 2, supra.

*Estoppel.* Finally, Treadwell argues that Hudson should be estopped from enforcing the indemnity agreement because Treadwell refrained from taking action to protect its employees from the smoke in reliance on Hudson's assurances that it would raise the stacks. In New York the doctrine of estoppel operates to prevent a party from receiving a contractual benefit which comes its way because, in rightful reliance upon that party's word or deed, the other contracting party has changed its position. Metropolitan Life Insurance Co. v. Childs Co., 230 N.Y. 285, 292, 130 N.E. 295, 298 (1921); Triple Cities Construction Co. v. Maryland Casualty, 4 N.Y.2d 443, 448, 176 N.Y.S.2d 292, 151 N.E.2d 856 (1958).

It appears from the record that Hudson did, with some frequency, assure Treadwell that it would soon raise the stacks. There is no indication in the record, however, that Treadwell would have taken action to protect its workers, absent these assurances, and no evidence that Treadwell changed its position in reliance on Hudson's assurances. Even so, Treadwell's reliance can hardly be justified under its contract with Hudson. Treadwell was not without power to influence the time of the extension of the stacks. According to the construction contract, it was Treadwell's responsibility to provide and install the necessary materials required to increase the height of the stacks.[5] It does not appear that Treadwell made any attempt to relieve the smoke hazard nor to fix a date when the stacks could be extended. In this posture the doctrine of estoppel does not aid Treadwell nor excuse its apparent lack of concern for the physical health of its employees.

We find no justification in the record to support Treadwell's final claim that Hudson frustrated the contractor's ability to perform its undertaking to elevate the stacks. The claim apparently refers to Hudson's continued operation of its boilers until September. If so, there is no indication that Treadwell requested them to stop their operation any earlier.

We hold the trial court correctly entered judgment for Hudson on Treadwell's indemnity agreement.

---

5. Defendant Hudson's Exhibit C—the Construction Contract provides:

"The scope of the work to be performed by the Contractor is as follows:—

6. Provide and install the necessary materials required to increase the height of Stacks on #4 Power Boiler and #2 Bark Boiler by fifty feet each; . . . . "