JOHN J. CAMPBELL *vs.* ROCKLAND TRUST COMPANY & another.

Suffolk.    January 6, 1942. — June 10, 1942.

Present: FIELD, C.J., QUA, DOLAN, & RONAN, JJ.

*Negligence*, Independent contractor, One owning or controlling real estate, Assumption of risk, Plumber.

The owner and operator of an apartment house was under no duty to warn an experienced master plumber and steam fitter, employed by him as an independent contractor to repair a leak in a pipe leading to a wall radiator and injured when the radiator fell on him while he was engaged in that work, of the fact, known to the owner, that the

radiator, which was fastened to the wall by lag bolts, was "shaky and loose," where it appeared from the steam fitter's testimony that, although the actual cause of such insecure condition was not visible, a reasonable examination by him would have revealed that condition and enabled him to avoid the injury.

TORT. Writ in the Superior Court dated January 10, 1939.

The action was tried before *Walsh*, J.

*I. Bernstein*, (*J. Finnegan* with him,) for the plaintiff.

*D. H. Fulton*, for the defendants.

DOLAN, J. This is an action of tort to recover for personal injuries, sustained by the plaintiff while engaged in repairing a leak in a steam pipe connected with a radiator in an apartment house owned and operated by the defendants. The case was tried to a jury, which returned a verdict in the amount of $875 for the plaintiff on each of the two counts of his declaration, which were stated to be for the same cause of action. Thereafter, subject to the plaintiff's exceptions, the judge entered a verdict for the defendants on each count under leave reserved. G. L. (Ter. Ed.) c. 231, § 120.

The evidence would have warranted the jury in finding the following facts: The plaintiff, who had been a master plumber and steam fitter for forty years in Boston, was residing in the apartment building here involved on November 28, 1938. One Greene, who managed the building and took charge of the repairs therein for the defendants, requested the plaintiff to fix a leak which was coming "from the end of the radiator" in the living room of the "top floor" apartment, occupied by one Burton. The plaintiff went up to the Burton apartment with his tools to fix the leak. He found that the leak was in the lower end of a steam pipe adjacent to and connected with the radiator. This steam pipe ran through the partition wall between the living room and a room adjacent to it. It ran through the wall horizontally and a vertical pipe was attached to it which ran to the radiator. In order to make the repairs the plaintiff put his Stillson wrench on the vertical pipe. He could not otherwise reach the horizontal pipe. He in-

tended to repair the leak by putting in another piece of pipe. As he began to unloosen the vertical pipe, the horizontal pipe broke at the wall and the radiator fell from the wall upon the plaintiff's right arm causing him to sustain a fractured right wrist and other injuries.

The radiator was a "wall" radiator and weighed about two hundred pounds. It was attached to the wall by two lag bolts, one on each side. These lag bolts "go into the wall, and the hangers come down over the bolts." The hangers, which were attached to the radiator, were three inches from the living room floor and neither they nor any part of the radiator touched the floor. The bolts were not visible since they were covered by the hangers. The horizontal and vertical pipes before referred to "were not part of the equipment to keep the radiator in place." The radiator fell "because the lag bolts were not holding into the wall since the base board through which the bolts were screwed was rotten and the holes were too large for the bolts." "You could not discover this in the months or years before the accident unless the radiator was taken down." It had been in place for about forty years before the accident.

The plaintiff was "fixing the leak in his own way. It was left to his skill and judgment." He was given no warning nor instructions. The insecurity of the radiator was not apparent upon visual inspection, but if he had placed his hand upon it and shaken it, or if he had gone "over to the radiator" and given it a "tap," he "would know [that] it was loose." Had he known that it was loose he would have blocked it up before he started to work on it, but because the lag bolts were in fact "practically useless" by reason of the decay of the base board, blocks would not have kept the radiator in position. All that was holding it in place was the connection with the steam pipe at the left of the radiator. The plaintiff testified that the strain on the steam pipe by the radiator caused the pipe to crack "when he turned part of it to get at the leak," but that "one" could not tell that the leak was due to this strain until after the accident happened. "By inspection, the

plaintiff could tell the pipe was wrought iron and that wrought iron breaks with strain."

Six weeks before the accident occurred, the tenant Burton told the defendants' manager, Greene, that this radiator was "shaky and loose" and that it shook when "weight . . . or any object" was placed upon it. Two days before the accident happened Greene "handled the radiator himself and looked at it." He did not tell the plaintiff that it was loose.

In the case at bar the plaintiff appears to have been an independent contractor. In the execution of the work which he contracted to do the defendants owed the same duty to the plaintiff as if he had been an employee who had been hired by them to perform the same kind of service. *Keough* v. *E. M. Loew's, Inc.* 303 Mass. 364, 365. As to this it is settled that the defendants owed no duty to the plaintiff with reference to risks and dangers incidental to the work which he had contracted to perform. *Ashton* v. *Boston & Maine Railroad,* 222 Mass. 65, 69–71, and cases cited. See *Kowalsky* v. *Conreco Co. Inc.* 264 N. Y. 125, 128, 129. He knew the leaking pipe was attached to the radiator through a connection with the vertical pipe, and that neither of these pipes was intended to function as a support for the radiator. He also knew that the horizontal pipe was made of wrought iron and that wrought iron breaks "with strain." The evidence would require findings that he had had occasion in his past experience to deal with radiators that were insecure and had taken measures to secure them, and that, had he made a reasonable examination of the radiator and its connections, he would have discovered that it was loose, due to insufficient support, and that in consequence an undue strain had been placed upon the leaking pipe. On his own testimony he could have gone over to the radiator and tapped it and thus have discovered that it was loose. The manner of executing the work was left to the plaintiff, and he was long experienced as a master plumber and steam fitter. See *Sylvain* v. *Boston & Maine Railroad,* 280 Mass. 503, 506. A very slight examination by him would have disclosed the insecure condition of the radiator, al-

though the actual cause thereof was not visible. Had he made the examination that it was his duty to make, he would have been put upon his guard. In all these circumstances, the jury was not warranted in finding, as they must have found, that the defendants were negligent in failing to warn the plaintiff that the radiator was "shaky and loose." It is true that the jury could have found that the defendants, through their agent, knew that the radiator was "shaky and loose," and that they did not warn the plaintiff of its condition, but we think that it cannot be said rightly that their knowledge was superior to that which the plaintiff could have acquired had he made the reasonable examination required of him. The injury sustained by him arose out of the work that he agreed to perform, and was one of the ordinary risks of his employment for which no liability arises and which he must be held to have assumed by his contract of service. *Archer* v. *Eldredge,* 204 Mass. 323, 325, 326.

*Exceptions overruled.*
*Judgment for the defendants.*